1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    ADAM CHRISTIAN GABRIEL,              Case No.  22-cv-00781-JD
8                    Plaintiff,
                                          **ORDER RE SUMMARY JUDGMENT**
9           v.                            **AND QUALIFIED IMMUNITY**
10
11   COUNTY OF SONOMA, et al.,
12                   Defendants.
13

14          On the night of June 2, 2021, defendant Deputy Shawn Forghani of the Sonoma County

15   Sheriff's Office was on patrol in response to a dispatch report of a carjacking in Santa Rosa.  The

16   suspect was described as an adult Hispanic male with a shaved head who was wearing a black

17   baseball cap, a white hoodie, and jean shorts, and driving a green Subaru.  Deputy Forghani saw a

18   silver Subaru at a stop sign driven by plaintiff Adam Gabriel.  Gabriel was a white male with a

19   beard, and was wearing a blue cap and a green t-shirt.  Deputy Forghani spotlighted Gabriel's car

20   and ordered him to put his hands up.  Gabriel complied by turning off the car, throwing his keys to

21   the pavement, and putting both hands in the air out of the driver's-side window.  Multiple police

22   vehicles arrived, and several officers trained their firearms on Gabriel.  In response to Deputy

23   Forghani's command, Gabriel stepped out of the car with his hands up.  He complied with

24   additional commands to walk toward Deputy Forghani and to kneel on the pavement with his

25   hands held high.  Deputy Forghani told Gabriel to go face down on the pavement, which Gabriel

26   did not immediately do.  Deputy Forghani said he would release a police dog if Gabriel did not

27   comply.  Gabriel stayed upright and was attacked by Deputy Forghani's dog.  Gabriel sustained a

28   bite wound to his bicep, which required hospitalization.

United States District Court

The entire incident was captured on bodycams worn by several officers on the scene, other than Deputy Forghani, who did not activate his personal camera.  Undisputed evidence establishes that Deputy Forghani did not believe during the incident that Gabriel fit the description of the carjacking suspect, and knew that Gabriel's car was a different color than the suspect's Subaru. He also saw no indication that Gabriel had a weapon.  Gabriel was never charged in connection with the carjacking, and a charge of obstructing Deputy Forghani's investigation was dropped by the Sonoma County District Attorney.

Gabriel sued Deputy Forghani and the County of Sonoma for the constitutional tort of use of excessive force under 42 U.S.C. § 1983 and the Fourth Amendment, and for state law claims of negligence per se and violation of the Bane Act.  Dkt. No. 1.[1]  The parties filed cross-motions for summary judgment, and Deputy Forghani has asked for qualified immunity.  *See* Dkt. No. 39 (defendants' motion); Dkt. No. 42 (plaintiff's motion).  Genuine questions of fact preclude summary judgment in favor of either side on the use of excessive force.  Summary judgment is denied in toto, and qualified immunity is also denied.

## BACKGROUND

The salient facts are undisputed, and all of the key events were captured on video.  *See* Dkt. Nos. 41 & 44.  At approximately 10:08 p.m. on June 2, 2021, Deputy Forghani and his canine partner, Max, responded to a report of an armed carjacking in Mountain View.  Dkt. No. 47-1, Exh. A (Forghani Depo.) at 67:2-8; 85:19-20.  A witness had placed the suspect's green Subaru Forester six or seven miles away, in an "industrial area of Cotati," and Deputy Forghani was searching nearby when he spotted headlights.  *Id.* at 68:20-69:4; 102:1-24.  He rounded a corner and saw Gabriel at the wheel of an idling Subaru wagon.  *Id.* at 89:11-18.  Deputy Forghani pulled about 50 feet ahead of Gabriel, put up his spotlight, identified himself, and directed Gabriel to put his hands up.  *Id.* at 116:1-117:3.

---

[1] Defendants say in a footnote that "[p]laintiff indicated that he will not be pursuing his Bane Act claim so that claim should be dismissed herein."  Dkt. No. 39 at 2 n.1.  The Court will not grant summary judgment on this basis.  If Gabriel is not pursuing the Bane Act claim, he may file a stipulation of dismissal.

United States District Court

United States District Court

1    Gabriel killed the engine and dropped the keys outside.  *Id*. at 157:23-158:2.  Deputy

2   Forghani radioed in his location, and within minutes, at least six officers arrived on the scene and

3   "went gunpoint on the Subaru."  *Id*. at 131:4-6; 157:3-5.  Gabriel's hands were in the air:





Dkt. No. 41, Exh. F (McCracken BWC) at 5:10:58; *id*., Exh. E (Fomasi BWC) at 11:54:55.[2]

_____

[2] Citations refer to the time stamps embedded in the footage lodged at Dkt. No. 41.

United States District Court

1    Gabriel's car was not a green Subaru Forester, but a silver Subaru Outback.  Dkt. No. 47-1,

2    Exh. A at 96:5-11.  It is also undisputed that Gabriel, a white male, looked nothing like the

3    carjacking suspect, who was a "Hispanic male" with a "shaved head" and wearing a "white

4    hoodie."  *Id*. at 76:22-77:3; 110:2-10.

5    Deputy Forghani knew immediately that Gabriel was not the reported suspect.  *Id*. at 99:3-

6    9.  He testified that he "never believed that this was the person that they had described."  *Id*.

7    111:3-4.  He also stated that there was no "indication" from dispatch "that more than one person

8    was involved."  *Id*. at 77:4-7.  Deputy Forghani "also didn't have information that led [him] to

9    believe there was not anybody else involved," *id*. at 99:10-14, and so, a few minutes after arriving

10   on the scene, he asked the dispatcher, "Did we ever get a second suspect description?"  The

11   answer was "Negative."  Dkt. No. 41, Exh. 2 ("Matrix") at 10:11:05.  Deputy Forghani did not

12   take this to mean there wasn't a second suspect, but that there might be one of unknown

13   description.  *See* Dkt. No. 47-1, Exh. A at 100:1-101:17.

14   In deposition testimony, Deputy Forghani said he was thinking about a second suspect

15   because he was certain he had identified the wrong person in the right vehicle.  *See id*. at 108:1-17.

16   He emphasized that he believed that Gabriel's car was "light green."  *Id*. at 99:20-21; 106:5-8.

17   When asked whether the fact that Gabriel's car was actually silver did not "give [him] reason to

18   suspect maybe this guy has nothing to do with the crime," Deputy Forghani responded that he "did

19   not believe it was a different color."  *Id*. at 108:23-109:7.  This was at odds with his own dispatch

20   report from 10:11 p.m., which identified Gabriel's car as a "Silver Subaru Forester."  *Id*. at

21   113:14-24; *see* Dkt. No. 41, Exh. 2, at 10:11:50.  Deputy Forghani testified that the color of the

22   car was "just one factor" that he considered when he decided to investigate Gabriel, and that in his

23   experience with eyewitness reports, "green" could mean anything "from black to white."  Dkt.

24   No. 47-1, Exh. A at 112:7-8; 105:21-106:8.

25   After officers had surrounded Gabriel's car, Deputy Forghani directed Gabriel to "slowly

26   open the door and walk towards me."  Dkt. No. 41, Exh. 2, at 10:12:12.  Gabriel hesitated for

27   about two minutes, remained in the car with his hands out of the driver's-side window, and asked

28   questions like, "What am I being stopped for?"; "Where is your search warrant?"; and "Am I

4

going to be under arrest?"  *See id*.  Deputy Forghani told Gabriel that he needed to exit the car, or he would be "bit by the dog."  *Id*. at 10:12:30.  When Gabriel asked again if he was under arrest, Deputy Forghani said with some frustration: "If you'd like to be under arrest for delaying and resisting, then yes, you're under arrest.  Step out of the vehicle."  *Id.* at 10:14:03.

Gabriel complied.  He exited the car with his hands up and followed Deputy Forghani's commands to walk towards him.  *Id.* at 10:14:16.

When Gabriel was about 15 feet away, Deputy Forghani told Gabriel to stop walking and get on his knees.  Dkt. No. 47-1, Exh. A at 162:16-25.



Dkt. No. 41, Exh. F at 5:14:34.

Gabriel promptly dropped to his knees and placed his hands in the air.  Dkt. No. 41, Exh. 2 at 10:14:35.

The following screenshot depicts Gabriel at that moment, from the perspective of the officer-worn camera closest to Deputy Forghani:

United States District Court

1
2
3
4
5
6
7
8
9
10
11



12  Dkt. No. 41, Exh. G (Pike BWC) at 5:14:39.

13        Once Gabriel was on his knees, Deputy Forghani ordered Gabriel to get on his stomach

14  and crawl towards him.  *See* Dkt. No. 41, Exh. 2 at 10:14:35.  Gabriel did not immediately

15  comply.  The parties quibble about the precise details of what happened next, but the video shows

16  that Gabriel yelled, "What crime have I committed?"  *Id*. at 10:14:41.  After that, and for about 10

17  more seconds, Gabriel remained on his knees with his arms up in the same cactus-like position,

18  facing Deputy Forghani.  *See id.* at 10:14:40-51.  While Gabriel remained on his knees, Deputy

19  Forghani repeatedly ordered him to crawl, and Gabriel repeatedly asked, "What crime have I

20  committed?"  Max barked with rising intensity.  Deputy Forghani said: "I'm not going to tell you

21  again.  You're going to get bit -- Schnell schnell schnell schnell!"  *Id*. at 10:14:51-53.  Just as

22  Deputy Forghani gave the canine warning, he deployed Max, who ran toward Gabriel, jumped on

23  top of him, and bit into his right bicep.  *Id*. at 10:14:53.  Officers placed Gabriel in handcuffs.  *Id.*

24  at 10:15:21.

25
26
27
28

United States District Court

Multiple body-worn cameras captured the moment of the canine deployment, and the videos show that Gabriel was on his knees with his hands in the air:



Dkt. No. 41, Exh. G at 5:14:48.



Dkt. No. 41, Exh. F at 5:14:52.

Gabriel testified that it seemed like the dog bit into his arm for 30 seconds before he was able to dislodge him.  Dkt. No. 42-2, Exh. F (Gabriel Depo.) at 136:11-22.  The video indicates approximately 5 seconds of bite contact.  Dkt. No. 41, Exh. G at 5:14:49-54.

Gabriel sustained puncture wounds and a substantial gash to his right bicep, as well as extensive bruising around the upper arm, chest, and back. *See* Dkt. No. 42-2, Exh. E (photos). He was taken to the hospital for treatment, and he recalled that hospital staff "kept having to come in every half hour and change all my pillows and sheets 'cause they were soaked with blood"; "had to monitor [a] blood clot for several days"; and "left the wound open because there was infection deep inside of the muscle that they were trying to let it [sic] drain out." Dkt. No. 42-2, Exh. F at 165:24-166:6. Gabriel returned to another hospital for treatment several days later, because his "entire arm had swelled up all the way from the shoulder down to [his] hand." *Id*. 164:8-11. Gabriel states that he continues to suffer from "nerve damage," numbness, and "tremors" in his right (dominant) hand; "disfigurement" of his right arm; and post-traumatic stress disorder, including anxiety around crowds and police. *Id*. at 166:22-167:4; 169:5-9; 177:1-7. Defendants do not dispute these statements.

## LEGAL STANDARDS

The summary judgment motions are governed by familiar standards, which are addressed in the Court's prior orders. *See*, *e.g.*, *Schmid v. Cnty. of Sonoma*, No. 19-cv-00883-JD, 2021 WL 1118077, at *2 (N.D. Cal. Mar. 24, 2021), *aff'd*, No. 21-15722, 2022 WL 1638198 (9th Cir. May 24, 2022). In pertinent part, summary judgment will be granted only in the absence of a genuine dispute of material fact. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id*. at 248. To determine whether there is a genuine dispute of material fact, the Court views the evidence in the light most favorable to the non-moving party, and draws all justifiable inferences in its favor. *Id*. at 255. The burden is on the parties to identify the relevant evidence. The Court will not root through the record for them. *See Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 989 (N.D. Cal. 2017), *aff'd sub nom. Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019).

In an excessive force case, the Court views "the facts in the light most favorable to the nonmovant, but [is] 'limited to considering what facts the officer[s] could have known at the time

of the incident.'" *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 815-16 (9th Cir. 2023) (quoting *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017)) (second alteration in original).  When, as here, a video of the incident exists and no one questions its accuracy, the Court views "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).  The Court will not "'credit a party's version of events that the record, such as an unchallenged video recording of the incident, quite clearly contradicts.'" *Sabbe*, 84 F.4th at 816 (quoting *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1149 n.1 (9th Cir. 2022)).  "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury; only in the absence of material disputes is it a pure question of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (internal citations and quotation marks omitted).

Even if an officer's conduct is objectively unreasonable, "'[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).  "Once a defendant has raised qualified immunity as a defense to a claim, a plaintiff must show (1) that the right was violated; and (2) that the right was clearly established at the time of the alleged misconduct." *Id*. (citation and internal quotation marks omitted).

## DISCUSSION

Because Deputy Forghani has raised the defense of qualified immunity, Gabriel must demonstrate that Deputy Forghani violated his Fourth Amendment rights by deploying a police dog in a manner that was clearly established as unconstitutional at the time of the incident.  *See Nicholson*, 935 F.3d at 690.

### I.   FOURTH AMENDMENT VIOLATION

To establish a predicate Fourth Amendment violation, Gabriel must show that he was subjected to an unreasonable seizure.  *See Sabbe*, 84 F.4th at 820-21.  The question is whether the use of the police dog was reasonable in connection with detaining and arresting Gabriel.  This inquiry is governed by *Graham v. Connor*, 490 U.S. 386 (1989), as applied in our circuit:

"Resolving all genuine disputes of material fact in [the non-movant's] favor, *Graham* requires that we consider 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted' and 'the government's interest in the use of force.'  We balance these two factors to determine whether the government's use of force was excessive."  *Sabbe*, 84 F.4th at 820-21 (quoting *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022)).

### A. Severity of Intrusion

"To gauge the type and amount of force used," the Court assesses "the risk of harm and the actual harm experienced."  *Sabbe*, 84 F.4th at 821 (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)).  "The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force."  *Id*.

"[C]haracterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances."  *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc).  In our circuit, dog bites have been characterized as "moderate" or "severe," depending on the degree of officer control over the dog and the actual harm inflicted.  *See Lowry*, 858 F.3d at 1257 (holding that force was "moderate" when the bite was brief and conducted under the control of officers); *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) (holding that force was "severe" when the dog bit the subject three times and dragged him several feet).

Gabriel says that the force here was "somewhere between the moderate use of force in *Lowry* and the severe use of force in *Chew*."  Dkt. No. 42-1 at 14.  The record supports this assessment.  Although the video demonstrates that the duration of the bite was not excessive -- this is not a situation where the dog locked down on the victim for 30 seconds or more or dragged him around -- the evidence of the severity of Gabriel's injuries is undisputed.  The bite caused multiple serious puncture wounds that became infected and caused lasting nerve damage in Gabriel's dominant hand.  These facts establish that the intrusion on Gabriel's Fourth Amendment rights was significant, and so the government's interest in the use of the force must also be significant.  *Sabbe*, 84 F.4th at 821.

**B. Government Interest**

"The government's interest in the use of force differs depending on: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Sabbe*, 84 F.4th at 822. "The immediate threat factor is the most important." *Id.* (internal quotation omitted).

**1. Severity of Crime**

Deputy Forghani's use of force is evaluated in light of the crime that he was investigating, which was carjacking. *See Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021). Although the government has a strong interest in apprehending felony suspects, *see Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003), Deputy Forghani knew from the start of the incident that Gabriel did not match the description of the suspect. His car also did not match the reports about the suspect's vehicle. The crime took place several miles away from the location of Gabriel's arrest. Nothing in the way of actual evidence indicated that Gabriel was engaged in criminal activity. Consequently, while there is no question that carjacking is a serious offense, any investigative urgency Deputy Forghani might have experienced is sharply attenuated by that fact that he did not have in hand an individual with any obvious connection to a crime.

**2. Immediate Threat**

Gabriel was at all times many feet away from any officer, and was surrounded by multiple police cars and officers with their weapons drawn. He was also many feet away from his car, which was turned off. There was no indication that bystanders posed a concern. As the bodycam screenshots demonstrate, Gabriel was on his knees with his hands in the air when Deputy Forghani released the police dog. *See also* Dkt. No. 47-1, Exh. A at 164:11-165:2 (Q: "So then you released your canine partner to bite him; correct?" A: "Yes." Q: "While he was on his knees with his hands in the air?" A: "Yes." Q: "And had, as far as you knew, six but ultimately more law enforcement officers with guns trained on him; is that correct?" […] A: "I knew I had at least two, maybe three guys with guns pointed at him. That's accurate, yes."). There was no sign that he had a weapon,

and Deputy Forghani never saw him make a move toward a possible weapon.  *See id*. at 158:25-159:3; 176:20-24.

On this record, it is difficult to see how an apparently unarmed individual kneeling in the street with his hands up and surrounded by multiple officers with weapons trained on him could pose any threat to officer safety, let alone an immediate threat.  *See Rice*, 989 F.3d at 1122-23 ("although [plaintiff] refused to cooperate," reasonable officer would know there was no immediate threat when suspect did not "yell or use profanity, attempt to flee or to harm the officers, or reach for any sort of weapon"); *Bryan v. MacPherson*, 630 F.3d 805, 827 (9th Cir. 2010) ("An unarmed, stationary individual, facing away from an officer at a distance of fifteen to twenty-five feet is far from an 'immediate threat' to that officer.").  Defendants speculate that Gabriel's car might have concealed a threat, Dkt. No. 39 at 20, but they did not support that guesswork with any evidence or a good explanation about what that might have been.  This ostensible concern is further diluted by the fact that Gabriel was a fair distance from his car, as the video shows, and another officer on the scene was "provid[ing] security on the Subaru should there be additional suspects hidden within the vehicle during the course of the high risk stop[.]" Dkt. No. 39-1, Exh. K (Fomasi Decl.) ¶ 3.  Deputy Forghani testified that several other officers "were still focused on the car" when he deployed his canine to bite Gabriel.  Dkt. No. 47-1, Exh. A at 164:17-165:2.

### 3.  Active Resistance or Evading Arrest

As the video demonstrates, Gabriel gave frequent voice to his anxiety and concern about the situation as it unfolded, but he did not fight or physically interact with any officer and was not positioned to evade arrest while kneeling on the street with his hands up.  Although he was vocal in communicating with the police, he complied with every command from the time Deputy Forghani spotlighted him to the release of the police dog.  Among other examples of cooperation, Gabriel turned off his car, threw his keys out, kept both of his hands extended away from his body and visible at all times to the officers, walked as directed toward Deputy Forghani, and knelt on the pavement as directed with his hands up.  The only instance of non-compliance was when

Gabriel hesitated to go face-down on the street and crawl at Deputy Forghani's command.  He did not attempt to get back on his feet or otherwise make a move to flee.

Consequently, the record demonstrates that Gabriel was, at worst, passively resistant.  As a result, "'the use of non-trivial force *of any kind* was unreasonable.'"  *Rice*, 989 F.3d at 1126 (9th Cir. 2021) (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013)) (emphasis in *Rice*).  It is true that Gabriel did not immediately go face down on the pavement when Deputy Forghani instructed him to, but "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."  *Nelson*, 685 F.3d at 881 (collecting cases); *see Rice*, 989 F.3d at 1123, 1127 (refusing multiple commands but not swearing at or threatening officers is passive resistance); *Gravelet-Blondin*, 728 F.3d at 1090, 1092 (refusing officers' commands to step back but making "no threatening gestures" is passive resistance).

Defendant's own evidence bolsters this conclusion.  Gabriel's conduct fell within the definition of passive resistance in the Sonoma County Sheriff's Office "Use of Force" Policy: "Refusal by a subject to comply with a deputy's verbal commands….This includes verbal and physical cues of non-compliance, not physically resistive, but not complying."  Dkt. No. 39-2, Exh. M-3 at 47.  He displayed none of the attributes listed under "active resistance/assaultive behavior."  *See id*. at 46.  Deputy Forghani conceded that repeated questioning of officers is "passive" resistance.  Dkt. No. 47-1, Exh. A at 144:16-145:15.

### C.  Balancing

Overall, the record demonstrates that Gabriel has a plausible case that the use of the dog amounted to excessive force.  "Our precedent clearly establishes that releasing a police dog to bite a person who neither endangers officers nor attempts to flee or resist arrest violates that person's Fourth Amendment right to be free from unreasonable seizure."  *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020) (unpublished) (citing *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) and *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)).  Our circuit held en banc, for example, that it could be unreasonable to deploy a canine to bite a passively resisting domestic violence subject who refused multiple officer commands, because "a rational jury could

1   very well find that he did not, at any time, pose a danger to the officers or others." *Smith v. City of*

2   *Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).  Because a reasonable jury could find that

3   Gabriel did not pose an immediate threat, summary judgment for the government is not warranted.

4   *Id.*

5          Even so, the record is not so free of factual dispute that summary judgment should be

6   granted in Gabriel's favor, as he urges.  Defendants contend that Gabriel posed a threat based on

7   their training and experience.  In defendants' view, although Gabriel was on his knees and

8   "appeared to start to comply" with Deputy Forghani's commands to crawl, he "immediately

9   popped upright and erect, did not get into a crawl position, and then let out an aggressive,

10  explosive scream," which are said to be "pre-assaultive" behaviors.  Dkt. No. 39 at 6 (emphasis

11  omitted).  This description is not readily squared with the video tape, but it is not "clearly

12  contradict[ed]" by it, either.  *Rice*, 989 F.3d at 1123.  Around the time that Gabriel got on his

13  knees, he lowered his arms slightly before returning them to an upright position.  *See* Dkt. No. 41,

14  Exh. F at 5:14:39.  He was also visibly angry and yelled again, "What crime have I committed?"

15  *Id.*, Exh. 2 at 10:14:42.  Deputy Forghani testified that "[t]here wasn't one individual factor that

16  made me send [the dog]," but that Gabriel "was screaming what crime have I committed or

17  something to that effect in this scream primal voice that led me to believe that if something wasn't

18  done right now he was going to do something."  Dkt. No. 47-1, Exh. A at 163:18-164:6.  Deputy

19  Forghani also said that Gabriel was "scanning around, taking, you know, point of where we were

20  all standing, whether he was targeting our locations for attack or targeting our locations for an

21  avenue of escape."  *Id.* at 160:2-6.  If believed by a jury, this testimony might establish a defense

22  to the excessive force claim.

23  **II.   QUALIFIED IMMUNITY**

24          Because Gabriel has a viable excessive force claim, the next question is whether Deputy

25  Forghani is entitled to qualified immunity.  "A Government official's conduct violates clearly

26  established law when, at the time of the challenged conduct, 'the contours of a right are

27  sufficiently clear' that every 'reasonable official would have understood that what he is doing

28  violates that right.'"  *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *Ashcroft v. al-*

United States District Court

*Kidd*, 563 U.S. 731, 741 (2011)).  "Although 'a case directly on point' is not necessarily required, a rule is only clearly established if it has been 'settled' by 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'clearly prohibit[s] the officer's conduct in the particular circumstances,' with 'a high degree of specificity.'"  *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018)).  Put plainly, the "clearly established" inquiry asks whether the officer had "fair notice" that he or she acted unconstitutionally.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

In an excessive force case, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation omitted).  The Supreme Court has expressly cautioned courts in the Ninth Circuit not to deny qualified immunity on generalizations about the use of force.  *See id*. at 104.  To determine whether the right was clearly established, the Court resolves all factual disputes and draws all reasonable inferences in the non-movant's favor.  *See Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022).

The "'right to be free from the application of non-trivial force for engaging in mere passive resistance'" has been "clearly established" in our circuit since 2001.  *See Rice*, 989 F.3d at 1126-27 (quoting *Gravelet-Blondin*, 728 F.3d at 1093).  The law is also clear that mere noncompliance with officer commands, which is all that Gabriel exhibited, is passive resistance.  *Id.  See Smith*, 394 F.3d at 702.  Defendants do not dispute that this law was clearly established on the night of June 2, 2021, when Gabriel was detained.  Rather, they try to sidestep it by insisting that Gabriel was "actively resistive" during the incident.  *See* Dkt. No. 46 at 15.  That is a characterization of the facts, and not a demonstration that the law was unclear or non-existent.  In addition, as the undisputed facts amply demonstrate, Gabriel's behavior cannot reasonably be characterized as active resistance.  It is true that he repeated questions and demanded answers, but he did so while complying with all of Deputy Forghani's orders up to the release of the dog.  If vocalizing alone were deemed active resistance, the term would have no boundaries and hence no meaning.

The law was also clear on June 2, 2021, that it was unreasonable to deploy a dog to bite a passively resistive suspect who is in a position of surrender and surrounded by armed officers.

Cases predating this incident made the law clear.  In *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994), a suspect with three outstanding felony warrants fled from police and hid in a scrapyard.  A police dog found Chew and bit him severely.  The court held that the deployment of the police dog could be unreasonable because Chew did not physically resist arrest and "was completely surrounded by the police."  *Id*. at 1443.  So too, here.  Gabriel never fled from the officers, did not have a weapon, did not threaten the officers, and was "completely surrounded" by armed officers at the time of the canine deployment.

In *Smith*, a 2005 en banc decision, the circuit court reversed a grant of summary judgment to officers who had released a dog on a domestic violence suspect who "continually ignored" commands, including to show his hands.  *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc).  Although Smith was suspected of a violent offense, at the time of arrest he was not "particularly bellicose" and did not show "any signs of fleeing the area."  *Id*.  That is akin to the situation here.  Gabriel did not physically resist arrest, give signs of flight, or do anything other than hesitate on occasion in response to Deputy Forghani's commands.

Defendants proffer a grab-bag of police dog cases to defend Deputy Forghani's conduct, but these cases turned on facts dramatically different from the ones here.  All of them involved known and dangerous suspects who were fleeing or hiding, not under officers' control, and who presented a clear threat to officer or public safety.  For example, in *Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003), the suspect was wanted for "attempting to flee from police by driving a car with a wanton or willful disregard for the lives of others."  *Id*. at 960.  Two deputies were searching for him in an unfamiliar, dark wood behind Miller's home, where he could easily stage an "ambush."  *Id*. at 965.  The officers were told that Miller was not "law enforcement friendly," and had reason to believe he was armed.  *Id*. at 960.  *Hughes v. Rodriguez*, 31 F.4th 1211 (9th Cir. 2022), and *Mendoza*, 27 F.3d 1357, also involved known suspects who actively evaded police and concealed themselves from view.  *See Hughes*, 31 F.4th at 1216 (suspect, who was a known member of a violent street gang, fled from jail and was hiding in a friend's home); *Mendoza*, 27 F.3d at 1358 (bank robbery suspect evaded arrest for by car and on foot and was hiding in bushes).  Notably, in *Hughes*, video evidence "flatly refute[d] Hughes' claim that he was standing … with

1    his arms up in surrender mode" at the time officers deployed a dog to bite him.  *Hughes*, 31 F.4th

2    at 1217; *see id*. at 1219 ("the bodycam footage did not show any attempts to surrender").

3         *Hernandez v. Town of Gilbert*, 989 F.3d 739 (9th Cir. 2021), involved an intoxicated DUI

4    suspect who led officers on a car chase and then tried to barricade himself inside his garage.  *Id*. at

5    742-43.  For eight minutes, officers deployed a carefully escalated use of force that started with

6    verbal commands, and then moved to control holds and pepper spray, before resorting to canine

7    deployment.  The officers were "entitled to qualified immunity" in circumstances where

8    "Hernandez did not surrender at any point" and physically resisted the officers' attempts to seize

9    him.  *Id*. at 745; *see id.* at 746-47.

10        All of this is in sharp contrast to the undisputed facts here.  Gabriel's conduct and overall

11   situation were a far cry from the active resistance, threat level, and the like in these cases.  Overall,

12   the record and governing law preclude a grant of qualified immunity to Deputy Forghani.

### III.    SECTION 1983 CLAIM AGAINST SONOMA COUNTY

14        To avoid summary judgment for the County on the Section 1983 claim, Gabriel must

15   demonstrate that a County policy, practice, or custom caused a deprivation of rights.  *Steel v.*

16   *Alameda Cnty. Sheriff's Off.*, 428 F. Supp. 3d 235, 238 (N.D. Cal. 2019) (citing *Monell v. Dep't of*

17   *Social Services of the City of N.Y.,* 436 U.S. 658 (1978)).  Local governments and their agencies

18   are "persons" subject to liability under Section 1983, and may be liable only when an official

19   policy or custom causes a constitutional tort.  *Monell*, 436 U.S. at 690 & n.54; *Streit v. Cnty. of*

20   *Los Angeles*, 236 F.3d 552, 564 (9th Cir. 2001).  To state a claim under Section 1983 against a

21   county defendant, a plaintiff must show: (1) that he or she was deprived of a constitutional right;

22   "(2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the

23   plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional

24   violation."  *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)

25   (internal quotation marks and citation omitted).  There must be a "direct causal link between a

26   municipal policy or custom and the alleged constitutional deprivation."  *Villegas v. Gilroy Garlic*

27   *Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378,

28   385 (1989)).

United States District Court

United States District Court

1     As a rule, proof of "a policy or practice requires more than a few occurrences of

2   challenged conduct.  A single or even a few isolated and sporadic incidents of unconstitutional

3   conduct are not enough to impose municipal liability under Section 1983."  *Escobar-Lopez v. City*

4   *of Daly City*, 527 F. Supp. 3d 1123, 1128 (N.D. Cal. 2021) (citing *Gant v. Cnty. of Los Angeles*,

5   772 F.3d 608, 618 (9th Cir. 2014)); *see also Gordon v. Cnty. of Orange*, 6 F.4th 961, 974 (9th Cir.

6   2021) ("Generally, 'a single incident of unconstitutional activity is not sufficient to impose

7   liability under *Monell*.'") (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)).

8   Allegations of "no more than an 'isolated or sporadic incident[ ]' ... cannot form the basis of

9   *Monell* liability for an improper custom."  *Saved Magazine v. Spokane Police Dept.*, 19 F.4th

10  1193, 1201 (9th Cir. 2021) (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996)).  The

11  practices must be "'so persistent and widespread as to practically have the force of law.'"

12  *Escobar*, 527 F. Supp. 3d at 1128 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

13     Gabriel did not adduce evidence of other dog use incidents that might plausibly

14  demonstrate a persistent and widespread practice for Section 1983 purposes.  He refers rather

15  vaguely to "use of force incidents," Dkt. No. 47 at 12, but did not demonstrate that those instances

16  were similar to this one in any meaningful way.  He also did not identify an express County policy

17  that might be said to have caused his injuries.  The County's "Canines" policy did not, on its face,

18  clearly authorize the dog use as depicted in the record here.  *See* Dkt. No. 39-2, Exh. M-4 at 106

19  (authorizing canine deployments for "immediate threat[s]," "physically resisting" suspects, and

20  "concealed" suspects, and when the "totality of the circumstances" makes such force "objectively

21  reasonable[]").

22     Gabriel's main contention is that the Section 1983 claim against the County should go

23  forward on an after-the-fact "ratification" theory.  Local government liability may be established

24  by ratification "when the officials involved adopted and expressly approved of the acts of others

25  who caused the constitutional violation.'"  *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d

26  1211, 1231 (9th Cir. 2014) (quoting *Trevino*, 99 F.3d at 920), *rev'd in part on other grounds sub*

27  *nom. City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015).  After-the-fact approval of a

28  subordinate's conduct may be evidence of a policy for Section 1983 purposes.  *See Larez v. City of*

*Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991); *see also Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020) (unpublished) (reversing grant of summary judgment to city where plaintiff identified evidence that final policymakers approved a canine deployment as consistent with city policy).

The record establishes that the canine deployment was administratively reviewed, determined to be "within" the County's "Use of Force" policy, and that the Sherriff, Mark Essick, approved the administrative decision.  Dkt. No. 47-1, Exh. F (Requests for Admission Nos. 7-9). Defendants do not dispute that the Sherriff is a final policymaker on the use of force within the Department.  Consequently, a reasonable jury could conclude that the after-the-fact approval of Deputy Forghani's conduct was evidence of a policy that caused Gabriel's constitutional deprivation, and so summary judgment is denied.

## IV.    NEGLIGENCE PER SE

Defendants ask for summary judgment on Gabriel's state-law claim for negligence per se, primarily on the ground that negligence per se is not a cause of action but instead an evidentiary rule that applies to negligence claims.  Dkt. No. 39 at 24.  Gabriel says that he is not pursuing a general negligence claim.  Dkt. No. 47 at 14.

"Negligence per se is an evidentiary presumption of liability that arises if a defendant is shown to have 'violated a statute, ordinance, or regulation of a public entity.'"  *Steel*, 428 F. Supp. 3d at 245 (quoting Cal. Evid. Code § 669).  Gabriel brought claims for negligence per se based on Deputy Forghani's alleged violations of California Penal Code sections 243(d) (battery causing serious bodily injury), 245(a)(1) (assault with a deadly weapon), 245(a)(4) (assault by any means of force likely to produce great bodily injury), and 399.5 (liability for injuries caused by dog trained to attack).  *See* Dkt. No. 1.  Defendants, who gave only cursory treatment to the negligence per se claim in their motion, have not met their burden of demonstrating an absence of facts in the record to support a finding for Gabriel under these statutes.

Defendants say for the first time on reply that Deputy Forghani cannot be liable for damages because he is a peace officer assigned to a canine unit.  *See* Dkt. No. 49 at 14-15 (citing Cal. Penal Code 399.5(e) and Cal. Civ. Code § 3342(d)).  That is a day late and dollar short, as

arguments raised for the first time in a reply brief are improper.  The Court declines to resolve this issue on such an untimely and anemic record, and will take it up later as warranted.  In addition, Section § 3342(d) is inapposite because it immunizes defendants from liability under Section 3342, which is not a basis for Gabriel's damages claim.

Defendants' suggestion that Deputy Forghani has immunity under California law for claims based on the use of force is also misdirected.  *See* Dkt. No. 39 at 25 (citing Cal. Gov. Code § 820.4).[3]  Defendants' arguments are again cursory and quite conclusory, and whether Deputy Forghani's use of force was reasonable cannot be resolved on summary judgment for all of the reasons discussed.

### CONCLUSION

Summary judgment is denied.  Qualified immunity is denied.  The parties are directed to jointly propose by April 15, 2024, a date for a jury trial in the first quarter of 2025.

**IT IS SO ORDERED.**

Dated:  March 27, 2024

_____
JAMES DONATO
United States District Judge

United States District Court

_____

[3] Defendants also cite Government Code § 845.8(b), but that statute concerns liability for injuries caused by a person resisting arrest, and not injuries inflicted upon such a person.

20